Filed 1/26/23  P. v. Sutton CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CEDRIC JERMAINE SUTTON et al.,<br><br>Defendants and Appellants. | F079285<br><br>(Super. Ct. Nos. BF165091A & BF165091B)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Kendall Dawson Wasley, under appointment by the Court of Appeal, for Defendant and Appellant, Cedric Jermaine Sutton.

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant, Darnell Devon Wheat.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Enid A. Camps and Craig S. Meyers, Deputy Attorneys General, for Plaintiff and Respondent.

Cynthia J. Zimmer, Kern County District Attorney, Christine Antonios and Bryant Estep, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.

-ooOoo-

**SEE CONCURRING AND DISSENTING OPINION**

Appellants Cedric Jermaine Sutton and Darnell Devon Wheat went to a McDonald's armed with loaded firearms and waited for two employees—Maria Cruz Pina and Lenor Santa Cruz—to arrive for work. When the employees arrived, Wheat and Sutton each grabbed one of them and directed them to the safe. The appellant who grabbed Pina demanded she open the safe, and when she hesitated to do so, fatally shot her and immediately fled. The other appellant tried to shoot Santa Cruz, but the gun did not go off, and he too fled.

Sutton and Wheat were convicted by jury of first degree murder of Pina (Pen. Code,[1] §§ 187, subd. (a), 189; count one). The jury found true the following special circumstances: lying in wait (§ 190.2, subd. (a)(15)); robbery (§ 190.2, subd. (a)(17)(A)), kidnapping (§ 190.2, subd. (a)(17)(B)), and burglary (§ 190.2, subd. (a)(17)(G)) felony murder; and gang murder (§ 190.2, subd. (a)(22)).

Appellants were also convicted of attempted premediated murder of Santa Cruz (§§ 664/187, subd. (a), 189; count two) and two counts of kidnapping to commit robbery as to each victim (§ 209, subd. (b); counts three & four).

As to each count, the jury found true allegations that appellants committed each offense for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)), as well as personal and vicarious gang-related firearm enhancements (§§ 12022.53, subds. (b), (d), (e)(1); 12022.53, subds. (b), (e)(1)).

In a bifurcated court trial, the court found true that Wheat had suffered a strike prior (§§ 667, subds. (c)-(j); 1170.12, subds. (a)-(e)); a prior serious felony (§ 667, subd. (a)); and a prior prison term (§ 667.5, subd. (b)).

As to count one, Sutton and Wheat each were sentenced to prison terms of life without the possibility of parole (LWOP), and consecutive sentences of 15 years to life for counts two, three, and four. As to each count, the court enhanced both Sutton and

---

[1] All further undesignated statutory references are to the Penal Code.

Wheat's sentences 25 years to life for the firearm enhancements under section 12022.53, subdivision (d). The court stayed punishment for the firearm enhancements under section 12022.53, subdivision (b) pursuant to section 654. In addition, Wheat's sentence for each count was enhanced by five years pursuant to section 667, subdivision (a), and his minimum parole eligibility dates for counts two, three, and four were doubled to 30 years due to the strike prior.

Sutton's aggregate sentence was a term of LWOP, plus 25 years to life, plus 15 years to life, plus 25 years to life, plus 15 years to life, plus 25 years to life, plus 15 years to life, plus 25 years to life. Wheat's aggregate sentence was a term of LWOP, plus 25 years to life, plus 30 years to life, plus 25 years to life, plus 30 years to life, plus 25 years to life, plus 30 years to life, plus 25 years to life, plus a 20-year determinate term.

On appeal, Sutton contends the evidence was insufficient to support he acted with the intent to kill Pina, and as such, several of the special circumstance findings as to him must be vacated. Sutton, joined by Wheat, also contends the felony-murder special circumstances must be vacated because felony-murder special circumstance liability is now indistinguishable from first degree felony-murder liability as amended by Senate Bill No. 1437 (2017-2018 Reg. Sess.; Senate Bill 1437), in violation of the Eighth Amendment's narrowing requirement for death-eligible offenses. Sutton, joined by Wheat, further contends the matter must be remanded for a youth offender parole hearing because section 3051's exclusion of young adult offenders who receive a sentence of life without the possibility of parole violates equal protection. Finally, in supplemental briefing, Sutton contends the true findings on his gang enhancements, gang-related vicarious firearm enhancements, and gang-murder special circumstance must be vacated in light of the enactment of Assembly Bill No. 333 (2021-2022 Reg. Sess.; Assembly Bill 333).

Wheat contends the judgment must be reversed in its entirety as to him because the court erroneously admitted evidence using DNA interpretation by TrueAllele software without first holding a hearing pursuant to *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) with defense access to the software source code.

We vacate the true findings on Sutton's gang enhancements, vicarious gang-related firearm enhancements, and gang-murder special circumstance and remand for the opportunity for the People to retry those allegations under the new requirements under Assembly Bill 333. In all other respects, we affirm the judgment.

## FACTS

**Events Prior to Charged Offenses**

Dionna Williams, Wheat's former wife, was initially charged with Sutton and Wheat as a codefendant; she pled guilty to accessory to murder in exchange for truthful testimony and credit for time served. Williams testified she met Wheat when she was 16 years old and entered a romantic relationship with him in May 2000. Wheat told Williams he was a member of the 11-8 East Coast Crips gang and went by "Capone." Williams and Wheat dated exclusively and lived together in California. Wheat supported them financially by selling drugs and passing fraudulent checks, in which Williams also participated. Around July 2000, Williams met Sutton, who was friends with Wheat and went by the name "Smurf." Over the course of her relationship with Wheat, Williams learned that Wheat's friends were also members of the 11-8 East Coast Crips.

In about April 2001, Williams and Wheat moved to Las Vegas, Nevada. Wheat supported Williams financially in Las Vegas by selling drugs. She and Wheat got married in July 2001. At some point in 2001, Williams's cousin, Shamika Robinson, and Robinson's boyfriend, Donte Denham, moved to Las Vegas and stayed with Williams and Wheat. Around July or August 2001, Wheat could no longer get drugs from his source and had to discontinue selling. One night when Williams was driving around with Wheat, they stumbled upon a McDonald's in Overton, Nevada. A couple of weeks later,

Williams, Robinson, Denham, and Wheat went back to that McDonald's. Wheat and Denham had come up with a plan to do an armed robbery there; Robinson was the driver, and Williams was the lookout.

They went early in the morning when it was still dark. Robinson parked the car, and Williams hid in bushes with a walkie-talkie, where she could see the outside of the McDonald's. Wheat had a stocking cap over his head and was wearing a hoodie. One of the victims of the robbery testified that when she and her coworkers approached the McDonald's that morning, she saw two Black men in black hoodies and black pants, with stockings over their faces run across a field and eventually approach them from behind. The men bound her and her coworkers' hands and feet with duct tape. They demanded the manager to open the safe, and she complied. At one point, one of the men put a firearm in the employee's face. Williams testified that Wheat and Denham stole a few thousand dollars from the McDonald's, and they lived on that money for a while. The day of the Overton McDonald's robbery, Robinson and Denham[2] moved out of Wheat and Williams's motel room.

Williams testified that after the Overton robbery, Wheat talked about doing another McDonald's robbery; he wanted to do one in "smaller areas" but where tourists would be. Williams went with Wheat to look at several different McDonald's. Wheat decided not to rob two of the McDonald's they looked at because one was too light and there were workers outside the other.

**Charged Offenses**

On August 11, 2001, Williams was with Wheat and Sutton in Wheat's car, a cream-colored Ford Crown Victoria early in the morning while it was still dark. Williams thought they were going to Las Vegas, and then became aware they were going to rob a McDonald's in Rosamond, California, that Wheat had previously discussed

---

[2] Denham was in custody from August 9, 2001 to August 16, 2001.

5.

robbing. Wheat was driving initially, but Williams took over before they entered the parking lot. Wheat and Sutton were wearing black hoodies and pantyhose/stockings pulled over their faces like masks. Williams saw Wheat and Sutton head to the drive-thru area where they laid down. Wheat had told Williams he always wanted to have the element of surprise over a situation.

Santa Cruz, a cook at McDonald's, testified that she and Pina arrived around 4:35 a.m. on August 11, 2001, to open the restaurant. Pina opened the door and told Santa Cruz to go inside, and as she walked in, Santa Cruz heard Pina scream. Two men had entered the store; one grabbed Pina, and the other grabbed Santa Cruz. Both men were wearing black clothing, pants, thick sweaters with sleeves, and something covering their faces. Both men had guns, and the man who was holding Santa Cruz held the gun close to her head. The man who grabbed Pina pushed her toward the safe. The man who grabbed Pina was yelling "hurry," and the man who grabbed Santa Cruz did not say anything. Pina was trying to open the safe but could not do so; Santa Cruz heard Pina say "I don't remember, I don't remember" in Spanish. While Pina was trying to open the safe, the man holding her shot her, and she fell to the ground. The shooter fled right away. The second man who had been holding Santa Cruz began to flee but turned around and pointed a gun at Santa Cruz before leaving. Santa Cruz called her friend and asked her to call the police, and the police arrived quickly after. Santa Cruz was unable to identify either appellant at trial.

Williams testified that when Wheat and Sutton exited the McDonald's, they were running fast, and Williams heard Wheat say on the walkie-talkie she had been using that he "killed the bitch." They got into the car and Williams drove to the freeway. Wheat was talking about how he was angry and shot the victim because she was trying to hit the alarm. Sutton said he was trying to kill the other employee but could not get the gun to shoot. Williams testified that Wheat and Sutton used the same guns Wheat and Denham used at the Overton robbery: Wheat had a sawed-off shotgun and Sutton had a revolver.

6.

The jury was shown surveillance footage from an Albertson's in the same shopping center as the McDonald's depicting a Crown Victoria passing through the parking lot several times in the hours before the crimes. The jury was also shown surveillance footage from inside the McDonald's depicting two subjects in all-dark clothing moving in the drive-thru area several times prior to the incident, as well as the shooting of Pina, the attempted shooting of Santa Cruz, and the fleeing of the suspects. A detective opined that the individuals who committed the crimes came from the vehicle passing through the parking lot.

Williams testified that after the incident they took the sawed-off shot gun to their room in Las Vegas. Wheat told his uncle, Mike Evans, he was responsible for what happened at McDonald's, and told Williams he regretted telling Evans because Evans threatened to turn him in. Williams and Wheat moved to Palmdale, California, in the fall of 2001. They lived together until January 2002 and supported themselves by passing fraudulent checks. In January 2002, Wheat and Williams got into an altercation culminating in Wheat hitting Williams in the face with a gun and threatening to kill her. Williams called the police, and they separated.

**Police Investigation**

Pina was dead when the police arrived. Police recovered a purple plastic shot cup wad and plastic over-wad for a shotgun from near Pina's body on the floor.

Police recovered several items that appeared to have been discarded near the scene: a black hoodie from the freeway on-ramp near the McDonald's; black pants and a nylon-like stocking cap tied at the top from further down the freeway; and a brown garden glove, a "makeshift" beanie made out of pantyhose, and a latex glove outside a nearby residence.

On August 20, 2001, a search warrant was executed on a motel room in Las Vegas where Denham was located, and two firearms were seized: a Ruger .22-caliber revolver and a Wards 16-gauge double-barrel side-by-side sawed off shotgun with a cut-down

7.

stock. Police also seized four rounds of .22-caliber ammunition, and a purple 16-gauge shotgun shell, as well as other ammunition.

Christina Rocca, Sutton's former wife, testified that Sutton went by "Smurf" or "Little Smurf." When they initially met, he denied being in a gang but eventually admitted to Rocca that he was a member of the 11-8 East Coast Crips. After June 2001, she met Sutton's friend, Wheat or "Capone."

At one point in their relationship, Rocca and Sutton went to the Rosamond McDonald's. Sutton "freaked out" as soon as Rocca pulled in the parking lot. Sutton told Rocca he could not go there. He stated he and Wheat attempted to rob it years before and that Wheat killed somebody while trying to get her to open the safe. Sutton told Rocca he was very young at the time and Wheat told him to ride with him but he did not know exactly what was happening. He said Wheat's girlfriend drove them there, and they wore all black. Sutton had a pistol, and Wheat had a sawed-off shotgun. Sutton said he laid down in the parking lot or drive-thru area, and the employees were two women. He said the victim spoke Spanish, and he and Wheat thought she was stalling or pretending not to speak English. Sutton told Rocca he would have killed the other employee but his gun jammed. After the incident, Sutton gave all the clothes he was wearing to his mother.

Rocca further testified that at times, over the following years, Sutton would take credit for the murder when he was drunk. He would get abusive toward her and tell her that if she was not careful, she "would have [her] noodles blown out like her," referring to the McDonald's employee who was killed. Sutton brought up the Rosamond incident to Rocca many times over the years, as an example of a mistake he had made but that he had started a new life since then. In 2009, she overheard him tell two of their friends about the incident multiple times. Sutton committed several acts of domestic violence against Rocca, and she separated from him in 2010.

In 2012, Rocca contacted the Kern County Secret Witness Program because she had been trying to leave Sutton and "was tired of running" from him. She told them about the Rosamond McDonald's incident because she wanted to know if it was true. Subsequently, detectives contacted her, and she was placed into the California Witness Relocation Program.

Rocca viewed the McDonald's surveillance footage of the incident and identified Wheat as the first person in the video—the one who grabbed and shot Pina—and Sutton as the second—the one who grabbed and attempted to shoot Santa Cruz. She recognized Wheat from the "way he carried himself" though she also testified Sutton's explanation of what happened contributed to her opinion. She knew the second man was Sutton "as soon as [she] s[aw] him move." She explained the video depicted Sutton's "body language to a tee" and that she "can see every which way he moves, especially the way he's holding the lady."

Evans testified in the fall of 2001 Evans learned about the murder at the Rosamond McDonald's from an employee at an AM/PM who was reading the paper. Approximately two to three weeks later, Wheat told him he, his wife, and Sutton were "involved with" that incident. Evans testified he did not really want to hear it. Eventually, he called the news about what Wheat told him because he had heard someone else got arrested for the robbery. In 2012, he spoke to law enforcement and told him that Wheat told him he, Sutton and Williams committed the robbery using Wheat's beige Crown Victoria.

In 2016, DNA analysis was performed on the items recovered near the scene. For a sample taken from the inside posterior neck and tag of the hoodie sweatshirt found on the freeway, Wheat could not be excluded as a potential contributor. The likelihood ratio, or likelihood of a true match versus a coincidental match in the African-American population, was 15 quintillion times to one; in the Caucasian population, 15 sextillion to one; and in the Hispanic population, 23 sextillion to one.

For a sample taken from the outside hip and pelvis area of the black pants, the DNA profile was a mixture. Wheat could not be excluded as a potential contributor, with a likelihood ratio of 49 million in the African American population, 54 billion in the Caucasian population, and 32 billion in Hispanic population. Pina could not be excluded as the primary contributor of DNA on the outside of the black pants, with a likelihood ratio of 840 million in the African American population, 1.2 billion in the Caucasian population, and 780 million in the Hispanic population.

For a sample taken from the inside waistband of the black pants, Wheat could not be excluded as a potential contributor, with a likelihood ratio of 52 quintillion in the African-American population, 84 sextillion in the Caucasian population, and 220 sextillion in the Hispanic population. A black nylon was found inside the black pants, and Wheat could not be excluded as a potential contributor, with a likelihood ratio of 510 quintillion for the African American population, 290 sextillion for the Caucasian population, and 2.0 septillion for the Hispanic population.

For a sample taken from the tied nylon found on the freeway, Sutton could not be excluded as a potential contributor, with a likelihood ratio of 15 trillion in the African American population, 60 trillion in the Caucasian population, and 24 trillion in the Hispanic population.

For a sample taken from the pantyhose beanie found at the nearby residence, Wheat could not be excluded as contributor, with a likelihood ratio of 54 quadrillion in the African American population, 100 quintillion in the Caucasian population, and 150 quintillion in the Hispanic population.

For a sample taken from the brown cloth glove found at the nearby residence, Wheat could not be excluded as a contributor, with a likelihood ratio of 46 quintillion in the African American population, 41 sextillion in the Caucasian population, and 120 sextillion in the Hispanic population.

Also in 2016, ballistics analysis was conducted on the firearms recovered from Las Vegas. An analysis comparing the shotgun recovered from Las Vegas and the wad recovered from the scene revealed it was the gun used to kill Pina. One of the .22 rounds recovered from Las Vegas had a firing pin strike on it but the round was still live meaning it did not go off. A comparison of the live round to the test-fires shot out of the revolver revealed that the firing pin strike came from the revolver.

**Uncharged Prior Bad Acts**

The prosecution presented evidence pursuant to Evidence Code section 1101, subdivision (b), which the jury was instructed they could consider in determining appellants' identity, intent, motive, or whether they acted with a common plan or scheme.

As to Sutton, the prosecution offered evidence that Sutton aided and abetted a robbery of employees of Washington Mutual Bank on April 25, 2002.

As to Wheat, in addition to the Overton robbery of McDonald's employees, the prosecution presented evidence that on June 21, 2000, Wheat attempted to rob a Ralph's supermarket. Williams testified that in June 2000, Wheat and his friend were planning on robbing a Ralph's supermarket in Rialto. Williams went with them to "scope out" the store. They pretended to grocery shop, and Wheat and his friend were looking at the setup of the store, locating where the safe was and how many employees were there at that time. Wheat attempted the robbery on a different day, but it was not successful. Surveillance footage showed five armed Black robbers in dark clothing. They did not gain access to the safe. No arrests were made in connection with this incident.

**Gang Evidence**

*Predicate Offenses*

The prosecution presented evidence of five offenses they argued the jury could use as predicate offenses to determine whether the 11-8 East Coast Crips engaged in a pattern of criminal gang activity.

11.

On May 25, 1996, Wheat committed a robbery of two men, along with 11-8 East Coast Crips gang members Evyn Mack, Mark Washington, and Reginald Pruitt, for which they were subsequently convicted.

On February 11, 2001, Emmanuel Vaughn, an 11-8 East Coast Crips gang member, shot and killed someone on 11-8 East Coast Crips territory and was subsequently convicted of murder. The police determined it "was related to actually a rash of shootings and gang-related crimes that were being committed in that area that month especially."

On June 27, 2001, Steven Hill, an 11-8 East Coast Crips gang member, was convicted of sales of rock cocaine.

The prosecution also argued the jury could consider the Overton robbery and the present offense when determining whether the prosecution had met its burden of proving predicate offenses.

### *Gang Expert*

Hector Beas, the prosecution's gang expert, testified that he had encountered members of the 11-8 East Coast Crips gang committing crimes together. He opined based on evidence presented at trial that Sutton and Wheat were both active members of the 11-8 East Coast Crips on or about August 11, 2001.

Beas testified that associating together or working together benefits the gang in several ways: working in numbers emboldens them, allowing them to better successfully commit a crime; they become more violent in bigger numbers and they know that gang members are less likely to cooperate with law enforcement if they are caught or arrested. "Putting in work" or committing crimes for the gang benefits the gang because (1) it shows the community that the gang is violent and makes the community less likely to report crimes for fear of retaliation; and (2) it is used as a recruiting tool because younger gang members want to be part of a tough gang. Crimes allow the gang to grow and thrive, allowing them to sell narcotics on the street without repercussion and buy flashy

12.

cars and clothing, which is also a recruiting tool because younger gang members want to be part of a gang that has money.

Beas was given a hypothetical based on the evidence presented on the August 11, 2001 Rosamond McDonald's attempted robbery and murder. Based on that hypothetical, Beas opined that the "robbery and the murder benefits the East Coast Crips in many ways." He explained:

> "First of all, by committing this robbery they're known to putting in work for the gang, so they're establishing theirselves as reliable gang members and guys who the older—or O.G.s or big homeys can rely on to go out and make money for the gang.
>
> "By committing the robbery, they're acting in a violent nature. So gang members often talk about their crimes. They distance themselves somehow from the crime, but they'll brag about it amongst other gang members because they trust each other and then that emboldens the gang. When the younger guys hear that the older guys are coming in these gangs, it makes them want to also commit these robberies.
>
> "It's used as a recruiting tool. They know that East Coast are the toughest guys around, the biggest, the baddest gang, and it makes young members want to join; so that expands the gang as a whole and then they— as they expand, they take over their territory, and they're emboldened to commit more violent acts. They sell narcotics in the middle of the daylight without fear of regular citizens calling the police because they fear they're going to be retaliated against. Also they earn respect within the gang; so the younger gang members want to be like these guys.
>
> "They work in association together 'cause they're less likely to get caught by the police. They use females as getaway drivers because police are looking for a certain description of certain suspects and they'll see a female in a car driving, they're less likely to get contacted. If they do get contacted by the police, they're not going to cooperate because they don't want to get that snitch label put on them because that means they're going to suffer the consequences, whether it be a beating or they can get killed for snitching to the police."

Beas further explained he believed the hypothetical was committed at the direction of the gang because "[g]ang members are expected to act in a violent manner by the older

13.

gang members.  Older gang members direct young gang members to commit these crimes in order to establish their sense of fear and intimidation within the community.  That's what the gang is all about, violence, earning your rep in the gang, and moving up in the totem pole; so based on that, I believe it's at the direction of 11-8 East Coast Crips."

Beas also testified the hypothetical would promote or further the gang because: "It allows the gang to grow when these gang members talk about the crimes.  By committing these robberies, there's fruits of the crime.  They're able to—'fruits' I mean like money they're able to filtrate through the gang and that allows them to buy weapons and narcotics.  With those weapons they're better able to control their territory, and with that territory they're free to sell their narcotics and that allows them to get money—more money into the gang and they use it as a recruiting tool, 'cause young members don't want to be part of a gang without money.  They want to be part of a gang that's flashy and has the money.  So it's a huge recruiting tool."

## DISCUSSION

I.     **Sufficiency of the Evidence to Support Special Circumstance Findings as to Sutton**

Sutton contends the evidence was insufficient to support a finding that he harbored the intent to kill Pina before or at the time Wheat killed her.[3]  He contends that because of this, true findings on three special circumstances must be vacated—the gang-murder

---

**3**     We note the jury found true that both Sutton and Wheat personally discharged a firearm causing death or great bodily injury within the meaning of section 12022.53, subdivision (d) and that both Sutton and Wheat were liable for the firearm enhancement under a vicarious theory within the meaning of section 12022.53, subdivisions (d) and (e)(1).  While this verdict is somewhat puzzling given the evidence is uncontroverted that only one shot was fired, no party raised this issue below nor raises any claim of error with regard to this issue on appeal.  The People's theory at trial was that Wheat was the shooter; they take this position on appeal as well.  We assume for the purpose of Sutton's argument that he was not the shooter and that his convictions were based on an aiding and abetting theory.

14.

special circumstance (§ 190.2, subd. (a)(22)); the lying-in-wait special circumstance[4] (§ 190.2, subd. (a)(15)); and the felony-murder kidnapping special circumstance (§ 190.2, subd. (a)(17)(B)). We conclude sufficient evidence supported a finding that appellant harbored the intent to kill Pina and, accordingly, the true findings on the special circumstance allegations.

In assessing a claim of insufficiency of the evidence, we review "the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Snow* (2003) 30 Cal.4th 43, 66.) Reversal on insufficiency of the evidence is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 639.) "Appellate inquiry into the sufficiency of the evidence 'does not require a court to " ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In other words, 'it is the jury, not the appellate court which must be convinced

---

[4]     Sutton points out in a footnote that the jury was incorrectly instructed they could find the lying-in-wait special circumstance true if they found he had acted with reckless disregard for human life as an improper alternative to finding he had the intent to kill but does not further any claim of reversible error with regard to that instruction beyond his sufficiency of the evidence argument. Therefore, we do not address whether the jury was misinstructed or whether this constituted reversible error. We only address whether the evidence was sufficient to support a finding Sutton harbored the intent to kill.

15.

of the defendant's guilt ….' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055–1056.) The substantial evidence standard applies both to convictions and special circumstance findings. (*People v. Jennings*, at p. 638.)

In order to prove the lying-in-wait special circumstance, the prosecution must prove "[t]he defendant intentionally killed the victim by means of lying in wait." (§ 190.2, subd. (a)(15).) Similarly, to prove the gang-murder special circumstance, the prosecution must prove "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." (§ 190.2, subd. (a)(22).) For these special circumstances to attach to one who is not the actual killer, it must be proven the person "with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree." (§ 190.2, subd. (c).)

For the felony-murder-kidnapping special circumstance, respondent contends the jury could have found it true by finding appellant had the intent to kill *or* that he was a major participant in the crime and acted with reckless indifference to human life and thus we should affirm the finding on the ground the evidence supports the latter theory. Sutton contends this would be improper, pointing out that as to the felony-murder-kidnapping special circumstance, the jury was not instructed on the latter theory[5] but only with CALCRIM No. 731, which requires the jury to find an intent to kill with regard to the felony-murder-kidnapping special circumstance, pursuant to section 190.2,

_____

[5]    The jury was instructed with CALCRIM No. 703, on felony-murder liability for an individual who was not the actual killer, but kidnapping was omitted from the special circumstances listed; they were instructed as follows:  "If you decide that a defendant is guilty of first degree murder but was not the actual killer, then, when you consider the special circumstances of *lying in wait, murder in the commission or attempted commission of a robbery, and murder in the commission or attempted commission of a burglary*, you must also decide whether the defendant acted either with intent to kill or with reckless indifference to human life."  (Italics added.)

16.

subdivision (a)(17)(M). We accept, for the purpose of Sutton's argument, that the jury was required to find he harbored the intent to kill for the purpose of the felony-murder-kidnapping special circumstance.

" 'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' " (*People v. Nguyen*, *supra*, 61 Cal.4th at p. 1055.) A jury may infer intent to kill from "the defendant's acts and the circumstances of the crime." (*People v. Smith* (2005) 37 Cal.4th 733, 741.) The jury can also consider evidence of motive, which is "often probative of intent to kill." (*Ibid.*)

We conclude the jury could have reasonably found beyond a reasonable doubt that Sutton harbored the intent to kill Pina to support the special circumstance findings. We acknowledge there are facts from which the jury could have reasonably inferred, as Sutton suggests, that the killing was done in the spur of the moment based on Pina's hesitancy or inability to open the safe, and therefore Sutton may not have harbored the intent to kill at the time of the killing. However, the substantial evidence standard requires us to affirm a finding if substantial evidence supports it even if the evidence also can be reconciled with a contrary finding. (See *People v. Jennings*, *supra*, 50 Cal.4th at p. 639.) Here, because the evidence does support the jury's finding that killing Pina and Santa Cruz were part of the overall robbery plan, and therefore that Sutton harbored the intent to kill Pina at the time she was shot, we must affirm the jury's special circumstance findings.

The evidence shows the robbery was pre-planned, and that for previous robberies by both Wheat and Sutton, planning included scoping out locations beforehand. Williams testified that Wheat scoped out robbery locations ahead of time, which included observing the lighting conditions and how many employees would be present, as in the Ralph's robbery. Rocca testified in the context of the Washington Mutual robbery, that Sutton and his coparticipants discussed the Ralph's guard and that he was an older

gentleman. The McDonald's robbery took place in the early morning hours when only Pina and Santa Cruz were scheduled to work, and Santa Cruz testified it was common for she and Pina to work mornings. This is all to say that the evidence supports a reasonable inference that Wheat and Sutton likely had knowledge or a reasonable expectation that they would be facing vulnerable victims, with little chance of intervention from an armed guard or bystander, and thus there was little reason for Sutton and Wheat to have been armed with loaded weapons unless part of the plan included killing the witnesses.

This inference is strengthened by the fact that Wheat ultimately did kill Pina, and Sutton did not demonstrate any outward manifestation of hesitancy or surprise or attempt to obtain medical treatment for Pina in reaction; instead, he immediately attempted to kill Santa Cruz. In addition, for years after the robbery took place, Sutton took credit for killing Santa Cruz as a means to intimidate Rocca, suggesting he maintained a cold and callous view toward the killing, from which the jury could further infer the intent to kill her at the time.

## II.     Alleged Eighth Amendment Violation by Senate Bill 1437's Amendment of the Felony-murder Rule

Effective January 2019, the Legislature passed Senate Bill 1437 "to amend the felony murder rule and the natural and probable consequences doctrine … to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) As relevant here, to amend the felony-murder rule, the bill added section 189, subdivision (e):

> "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless

indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e).)

Sutton, joined by Wheat, argues that with the passage of Senate Bill 1437, the special circumstances statute no longer performs a narrowing function, as required by the Eighth Amendment to the federal Constitution, because every person who is convicted of first degree felony murder would be eligible for the death penalty.

Respondent contends that appellants do not have standing to raise the issue because they were not sentenced to death. We disagree. Article III of the United States Constitution requires that a petitioner raising a death penalty challenge under the Eighth Amendment have standing to do so. (See *Whitmore v. Arkansas* (1990) 495 U.S. 149, 154–155.) However, appellants acknowledge they were not sentenced to death, but request that we extend capital punishment jurisprudence to defendants who receive LWOP sentences. We conclude that because appellants are contending that their LWOP sentences are unconstitutional, they have standing to raise this narrow issue. (See *Ulster County Court v. Allen* (1979) 442 U.S. 140, 154–155 ["A party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights"].)

As to whether the Eighth Amendment's narrowing requirement extends to LWOP sentences, Sutton acknowledges that the United States Supreme Court has held it does not (*Harmelin v. Michigan* (1991) 501 U.S. 957, 995–996), but nonetheless that we should conclude otherwise since the issue is "ripe for reconsideration" based on subsequent case law and other authority Sutton contends demonstrate there is "vanishingly little difference" between an LWOP sentence and a death sentence. (See, e.g., *Graham v. Florida* (2010) 560 U.S. 48 [holding the Eighth Amendment prohibits imposition of LWOP sentences on juvenile offender who did not commit homicide]; see also Governor Newsom's March 13, 2019 Executive Order N-09-19 [ordering executive moratorium on the death penalty].)

We are bound by the holding of *Harmelin* (U.S. Const., art. VI, cl. 2; *Governor Gray Davis Com. v. American Taxpayers Alliance* (2002) 102 Cal.App.4th 449, 468) and thus we decline to extend the narrowing requirement to LWOP sentences.  Although this resolves this matter, even if we were to find the narrowing requirement extended to LWOP sentences, we would reject appellants' claim because the felony-murder special circumstance is sufficiently narrow.

"The United States Supreme Court's capital punishment jurisprudence rests on the principle that ' " 'the infliction of a sentence of death under legal systems that permit this unique penalty to be … wantonly and … freakishly imposed' " ' violates the Eighth and Fourteenth Amendments to the federal Constitution."  (*People v. Bacigalupo* (1993) 6 Cal.4th 457, 465.)  To satisfy the Eighth Amendment, the capital punishment scheme must narrow, or "circumscribe the class of persons eligible for the death penalty."  (*Zant v. Stephens* (1983) 462 U.S. 862, 878.)

Our Supreme Court has held the felony-murder special circumstance performs the narrowing function required by the Eighth Amendment.  (*People v. Bacigalupo*, *supra*, 6 Cal.4th at p. 467.)  Division One of the Fourth District Court of Appeal recently held, "[t]he felony-murder special-circumstance statute still performs this narrowing function, even after the enactment of Senate Bill No. 1437."  (*People v. Wilkins* (2021) 68 Cal.App.5th 153, 165 (*Wilkins*).)  This is because "[i]t makes a subclass of murderers— first degree felony murderers—death eligible … [and] does not apply to other murderers such as second degree murderers or simple murderers."  (*Ibid*.)  Therefore, "[b]ecause the statute renders a mere subset of murderers eligible for the death penalty, it sufficiently narrows the overall class of murderers as required by the Eighth Amendment.  (*Ibid*.)

It is not problematic that the elements of first degree felony murder are identical to the elements defining death eligibility under the felony-murder special-circumstance statute.  Our Supreme Court has upheld amendments under similar circumstances.  (See *People v. Johnson* (2016) 62 Cal.4th 600, 636 [amended lying-in-wait special

20.

circumstance satisfied Eighth Amendment requirements where it mirrored lying-in-wait first degree murder]; *People v. Catlin* (2001) 26 Cal.4th 81, 158 [murder-by-poison special circumstance upheld where it merely repeated the elements of first degree murder-by-poison].)

We agree with the reasoning in *Wilkins* and therefore reject appellants' claim irrespective of whether the narrowing requirement applies to LWOP sentences.

**III.     Alleged Equal Protection Violation of Section 3051's Exclusion of Youthful Offenders Serving an LWOP Sentence for an Offense Committed Between the Ages of 18 and 25**

Section 3051 provides in relevant part that a youth offender parole hearing shall be conducted for any prisoner 25 years of age or younger at the time of his or her controlling offense.  The statute includes an exclusion in any cases where an individual is sentenced to LWOP where the controlling offense was committed when the person was 18 years old or older.

Prior to sentencing, Sutton, joined by Wheat, requested a continuance to prepare for a youth offender sentencing hearing pursuant to *People v. Franklin* (2016) 63 Cal.4th 261.  The court denied the request, reasoning that Sutton and Wheat were not eligible for a youth offender parole hearing due to their receiving LWOP sentences.

On appeal, Sutton, who was 19 years old at the time of the commission of the crime, joined by Wheat, who was 23 years old at the time of the commission of the crime, argue that section 3051's exclusion of offenders between the ages of 18 and 25 (young adult offenders) serving an LWOP sentence violates the equal protection clause with regard to two groups:  (1) individuals who committed crimes under the age of 18 (juvenile offenders) for which they received LWOP sentences; and (2) young adult offenders who received sentences with the possibility of parole.

"Both the state and federal Constitutions extend to persons the equal protection of the law."  (*People v. Chatman* (2018) 4 Cal.5th 277, 287.)  An equal protection challenge

requires a showing that the government has adopted a classification affecting two or more similarly situated groups in an unequal manner. (*People v. Wilkinson* (2004) 33 Cal.4th 821, 836.) The level of scrutiny we apply depends on the type of classification. (*Ibid.*) Statutes involving neither a suspect class like race or national origin nor those impinging on fundamental rights, like the statute here, are subject to the minimum equal protection standard—rational basis review. (*People v. Turnage* (2012) 55 Cal.4th 62, 74.)

Under the rational basis review, "equal protection of the law is denied only where there is no 'rational relationship between the disparity of treatment and some legitimate governmental purpose.' " (*People v. Turnage*, *supra*, 55 Cal.4th at p. 74.) "To successfully challenge a law on equal protection grounds, the defendant must negate ' " 'every conceivable basis' " ' on which 'the disputed statutory disparity' might be supported. [Citation.] 'If a plausible basis exists for the disparity, "[e]qual protection analysis does not entitle the judiciary to second-guess the wisdom, fairness, or logic of the law." ' " (*People v. Acosta* (2021) 60 Cal.App.5th 769, 778 (*Acosta*).)

The majority of published case law on this issue has rejected appellants' arguments and upheld the constitutionality of the provision. (See, e.g., *People v. Jackson* (2021) 61 Cal.App.5th 189 (*Jackson*); *Acosta*, *supra*, 60 Cal.App.5th 769; *In re Williams* (2020) 57 Cal.App.5th 427.)

With regard to juvenile LWOP offenders and young adult LWOP offenders, the *Acosta* court held the two groups were similarly situated for the purpose of section 3051 and that there is a rational basis for distinguishing between them: "their age." (*Acosta*, *supra*, 60 Cal.App.5th at pp. 778–779.) The *Acosta* court noted the Legislature's decision to include juvenile LWOP offenders in 2017, was in response to the United States Supreme Court's decision in *Montgomery v. Louisiana* (2016) 577 U.S. 190, which held the court's prohibition of mandatory LWOP sentences for juvenile offenders prescribed by *Miller v. Alabama* (2012) 567 U.S. 460 was retroactive. (*Acosta*, at pp. 777, 779–780.) The *Acosta* court reasoned that the Legislature did not include young

adult LWOP offenders "presumably because *Montgomery* did not compel" it and concluded that the Legislature "thus had a constitutionally sufficient basis for distinguishing juvenile LWOP offenders from young adult LWOP offenders." (*Acosta*, at pp. 779–780; see *Roper v. Simmons* (2005) 543 U.S. 551, 574 ["a line must be drawn," and "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood"].) Similarly, the *Jackson* court assumed, without deciding, the juvenile LWOP offenders and young adult LWOP offenders were similarly situated and rejected the defendant's argument because "both the United States Supreme Court and our high court have repeatedly found the bright line drawn between juveniles and nonjuveniles to be a rational one when it comes to criminal sentencing." (*Jackson*, *supra*, 61 Cal.App.5th at pp. 196–197.)

With regard to young adult offenders serving a sentence permitting parole and young adult LWOP offenders, the *Acosta* court held the two groups were similarly situated for the purpose of section 3051 and that there was a rational basis for distinguishing between them: "the severity of the crime committed." (*Acosta*, *supra*, 60 Cal.App.5th at pp. 779, 780.) The court explained, quoting *In re Williams*, " 'The Legislature has prescribed an LWOP sentence for only a small number of crimes. These are the crimes the Legislature deems so morally depraved and so injurious as to warrant a sentence that carries no hope of release for the criminal and no threat of recidivism for society. In excluding LWOP inmates from youth offender parole hearings, the Legislature reasonably could have decided that youthful offenders who have committed such crimes—even with diminished culpability and increased potential for rehabilitation—are nonetheless still sufficiently culpable and sufficiently dangerous to justify lifetime incarceration.' " (*Acosta*, at p. 780; *In re Williams*, *supra*, 57 Cal.App.5th at p. 436.) The *Jackson* court analyzed the matter differently, concluding that because an LWOP sentence is based on the existence of aggravating factors that are absent in non-LWOP first degree murder, the two groups are not similarly situated. (*Jackson*, *supra*,

61 Cal.App.5th at p. 199.) The *Jackson* court nonetheless concluded that even if the groups were similarly situated, "public safety, and the desire to punish those persons who commit first degree special circumstance murder more harshly than persons who commit first degree murder without aggravating circumstances, provide a plausible basis for our Legislature to treat these two classifications differently for purposes of section 3051." (*Id*. at p. 200.)

Appellant asks that we follow Justice Pollak's concurring and dissenting opinion in *People v. Morales* (2021) 67 Cal.App.5th 326 (*Morales*). In that opinion, Justice Pollak "d[id] not question" that the difference between juvenile LWOP offenders and young adult LWOP offenders did not violate equal protection principles because "[t]he justification for treating minors more favorably than adults is so well rooted in our law." (*Id*. at p. 351 (conc. & dis. opn. of Pollak, J.).) Justice Pollak noted, however, that in determining whether a rational basis exists to treat young adult LWOP offenders and young adult offenders serving a sentence permitting parole, "the purpose of the statute is critical." (*Ibid*.) Justice Pollak observed section 3051 "is intended to permit evaluation of whether, over an extended period of incarceration, an individual who committed a serious crime while still youthful has been rehabilitated and can be released from custody without risk to the public." (*Morales*, at p. 352 (conc. & dis. opn. of Pollak, J.).) As this intention was informed by "the body of scientific knowledge showing that the areas of a person's brain affecting judgment and decisionmaking continue to develop at least through the age of 25" (*ibid*.), Justice Pollak concluded that the greater culpability attached to an LWOP sentence "may justify a harsher sentence but it does not explain why a youthful LWOP offender who has been rehabilitated should remain imprisoned beyond the number of years after which a rehabilitated non-LWOP youthful offender sentenced to life imprisonment may be considered for parole" (*id*. at p. 353 (conc. & dis. opn. of Pollak, J.)). Justice Pollak concluded the different treatment was "irrational and a denial of equal protection." (*Id*. at p. 355.)

24.

Recently, while this appeal was pending, Division 7 of the Second District Court of Appeal decided *People v. Hardin* (2022) 84 Cal.App.5th 273, review granted January 11, 2023, S277487, which further supports appellants' position. There, the appellate court held that denying a youth offender parole hearing to individuals sentenced to LWOP for offenses committed when they were between the ages of 18 and 25 violates equal protection. (*Id*. at p. 291.) The court concluded young adult offenders sentenced to LWOP and all other young adult offenders were similarly situated and that there was no rational basis for distinguishing between young adult offenders sentenced to LWOP and other young adult offenders for the purposes of section 3051, and therefore that it violated equal protection. (*People v. Hardin*, at pp. 286–291.) The *Hardin* court reasoned that because the stated legislative goal was to apply youth-related mitigating factors, as articulated in *Miller*, "in light of neuroscience research that demonstrated the human brain continues to develop into a person's mid-20's, and thus to permit youth offenders a meaningful opportunity for parole if they demonstrate increased maturity and impulse control, then for that purpose there is no plausible basis for distinguishing between same-age offenders based solely on the crime they committed." (*Hardin*, at p. 288.)

We agree with the majority of the published case law that the provision does not violate equal protection. We acknowledge some courts have expressed reservation in rejecting equal protection challenges and have encouraged the Legislature to consider repealing the exclusion for young adult LWOP offenders in section 3501, subdivision (h) (see, e.g., *Acosta*, *supra*, 60 Cal.App.5th at p. 781) and, further, that in the Supreme Court's denial of a petition to review in *Jackson*, Justice Liu authored a concurring statement asserting his view that section 3501's parole eligibility scheme is "in tension with equal protection of the laws." (*Jackson*, *supra*, 61 Cal.App.5th at p. 202 (conc. stmt. of Liu, J.).)

25.

However, rational basis review sets a "high bar," which ensures "that democratically enacted laws are not invalidated merely based on a court's cursory conclusion that a statute's tradeoffs seem unwise or unfair." (*Chatman*, *supra*, 4 Cal.5th at p. 289.) "[T]he rational basis standard does not give courts free license to judge the wisdom or desirability of statutes or to act as a super-Legislature." (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 880, fn. 5.) Because appellants have not met their burden "to negat[e] every conceivable basis" (*Heller v. Doe* (1993) 509 U.S. 312, 320) that might support section 3051's exclusion of youthful offenders who are serving an LWOP sentence, their equal protection challenge fails.

**IV.    Assembly Bill 333**

While this appeal was pending, the Legislature enacted Assembly Bill 333 (Stats. 2021, ch. 699, §§ 1-5). In supplemental briefing, Sutton contends the enactment of Assembly Bill 333 merits reversal of his gang enhancements (§ 186.22, subd. (b)), gang vicarious firearm enhancements (§ 12022.53, subds. (d), (e)(1)), and the gang-murder special circumstance (§ 190.2, subd. (a)(22)).

**A.    *Legal Background***

Before Assembly Bill 333 was enacted, section 186.22 defined a " 'criminal street gang' " as "any ongoing organization, association, or group of three or more persons, … having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (Former § 186.22, subd. (f); Stats. 2017, ch. 561, § 178.) To establish a "pattern of criminal gang activity," the prosecution needed to prove only that those associated with the gang committed two or more predicate offenses within a period of three years and that the offenses were committed on separate occasions, or by two or more persons on the same occasion. (*Menifee v. Superior Court* (2020) 57 Cal.App.5th

343, 362.) A predicate offense could be established by evidence of the charged offense. (*Ibid.*)

Assembly Bill 333 increased the evidentiary requirements to prove a gang-related enhancement in several respects. First, it narrowed the definition of " 'criminal street gang,' " by deleting the word "individually" from the phrase "whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).) There is a split of authority among the appellate courts as to whether or not the deletion of the word "individually" from former section 186.22, subdivision (f) means that the statute now requires the prosecution to prove that two or more gang members committed each predicate offense (compare *People v. Delgado* (2022) 74 Cal.App.5th 1067 (*Delgado*) with *People v. Clark* (2022) 81 Cal.App.5th 133 (*Clark*), review granted Oct. 19, 2022, S275746), and the issue is currently pending before the Supreme Court.[6]

Assembly Bill 333 added a definition for "to benefit, promote, further, or assist," defining it as "to provide a common benefit to members of a gang where the common benefit is more than reputational." (§ 186.22, subd. (g).) Pursuant to newly added section 186.22, subdivision (g), "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

Assembly Bill 333 also created stricter requirements to prove "a pattern of criminal gang activity." Under the new legislation, (1) the last predicate offense must

---

[6] The issue to be argued in *Clark* is: "Can the People meet their burden of establishing a 'pattern of criminal gang activity' under Penal Code section 186.22 as amended by Assembly Bill No. 333 (Stats. 2021, ch. 699) by presenting evidence of individual gang members committing separate predicate offenses, or must the People provide evidence of two or more gang members working in concert with each other during each predicate offense?"

have occurred not only within three years of the prior predicate offense, but also within three years of the date of the currently charged offense; (2) the predicate offense must have "commonly benefited a criminal street gang," and that benefit must be "more than reputational"; and (3) the currently charged offense cannot be used as a predicate offense. (§ 186.22, subds. (e)(1)-(2), (g).)

Assembly Bill 333's "changes to section 186.22 affect not only the gang enhancement allegations under that statute but other statutes that expressly incorporate provisions of section 186.22." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 346.)  As relevant here, for the purposes of Sutton's argument, the vicarious firearm enhancements require proof that the defendant violated section 186.22, subdivision (b)." (§ 12022.53, subd. (e)(1)(A)-(B).)  Further, section 190.2, subdivision (a)(22) requires proof that the defendant "was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22." (§ 190.2, subd. (a)(22).)

**B.**    *Additional Factual Background*

In the present case, the jury was instructed based on the old requirements of section 186.22.  As relevant here, the jury was instructed that to determine whether a "pattern of criminal gang activity" existed, they needed to find the most recent predicate offense occurred within three years of one of the earlier crimes and that the crimes "need not be gang-related."  The jury was not instructed they needed to find the predicate offenses benefited the gang or that the benefit was more than reputational.

**C.**    *Parties' Contentions*

Sutton contends the jury was prejudicially misinstructed on the gang-related enhancements and, alternatively, that the evidence presented at trial was insufficient to support the gang-related enhancements and gang-murder special circumstance.

Respondent agrees Assembly Bill 333 applies retroactively to Sutton as to the gang enhancements (§ 186.22, subd. (b)) and the vicarious firearm enhancements (§ 12022.53, subd. (e)), but as to those enhancements, remand is not required because in

28.

light of overwhelming evidence supporting gang enhancements, we can conclude beyond a reasonable doubt the jury would have found the enhancements true even under Assembly Bill 333's more stringent requirements. Respondent further contends Assembly Bill 333 constitutes an unconstitutional amendment of Proposition 21 as applied to the gang-murder special circumstance (§ 190.2, subd. (a)(22)).

This court allowed the Kern County District Attorney's Office to file an amicus curiae brief. In that brief, they expand upon respondent's argument, contending Assembly Bill 333 in its entirety is an unconstitutional amendment of Proposition 21.

**D.** *Analysis*

**1.** **Constitutionality of Assembly Bill 333**

"The Legislature may not amend an initiative statute without subsequent voter approval unless the initiative permits such amendment, 'and then only upon whatever conditions the voters attached to the Legislature's amendatory powers.' " (*People v. Superior Court* (*Pearson*) (2010) 48 Cal.4th 564, 568.) Nonetheless, " '[t]he Legislature remains free to address a " 'related but distinct area' " [citations] or a matter that an initiative measure "does not specifically authorize or prohibit." ' " (*Id*. at p. 571.) In deciding whether a particular piece of legislation has amended an initiative, our Supreme Court has framed the question as whether the legislation "prohibits what the initiative authorizes, or authorizes what the initiative prohibits." (*Ibid*.)

Respondent's argument regarding the gang-murder special circumstance has been considered by other courts, including this one, and their conclusions are split.[7] The legal background to respondent's argument is well summarized in *People v. Lee* (2022) 81 Cal.App.5th 232 (*Lee*), review granted October 19, 2022, S275449: "The gang-

---

[7] The issue of whether Assembly Bill 333 unconstitutionally amends Proposition 21, if applied to the gang-murder special circumstance, is to be briefed and argued before the Supreme Court in *People v. Rojas*, review granted October 19, 2022, S275835.

murder special circumstances, section 190.2, subdivision (a)(22), was enacted by the voters as section 11 of Proposition 21 on the March 7, 2000 ballot. [Citation.] Under the California Constitution, an initiative statute can be amended 'only when approved by the electors unless the initiative statute permits amendment or repeal without the electors' approval.' [Citations.] Proposition 21 does not permit amendment except by the electors' approval or by legislative amendment passed by two-thirds vote in each house. [Citation.] Assembly Bill 333 was enacted without voter approval, and without the requisite two-thirds votes in both houses of the Legislature." (*Lee*, at p. 240.) Because Proposition 21 added section 190.2, subdivision (a)(22), which incorporates by reference the definition of "criminal street gang," respondent contends the Legislature may not amend the definition of "criminal street gang" as it relates to section 190.2, subdivision (a)(22), without a two-thirds approval based on the principle of statutory construction that " 'where a statute adopts by specific reference the provisions of another statute, regulation, or ordinance, such provisions are incorporated in the form in which they exist at the time of the reference and not as subsequently modified.' " (Italics omitted.)

A divided panel of this court agreed with respondent's argument in *People v. Rojas* (2022) 80 Cal.App.5th 542 (*Rojas*), and held that Assembly Bill 333 was an unconstitutional amendment as applied to section 190.2, subdivision (a)(22). The majority reasoned that Assembly Bill 333 was an amendment to section 190.2, subdivision (a)(22) because it " 'takes away' from the scope of conduct that Proposition 21 made punishable under section 190.2." (*Rojas*, *supra*, 80 Cal.App.5th at p. 555.)

The court in *Lee*, however, rejected respondent's contention, reasoning the rule of statutory construction they relied on "is not to be mechanically applied." (*Lee*, *supra*, 81 Cal.App.5th at p. 241.) The *Lee* court reasoned the voters "did not contemplate a time-specific incorporation of the then-current version of section 186.22, subdivision (f), into the gang-murder special-circumstance statute." (*Ibid*.) The *Lee* court explained, "Section 186.22 was originally enacted by the Legislature in 1987. [Citation.] As part of

Proposition 21, in March 2000 the electorate amended certain provisions of section 186.22 by increasing the sentences of the gang enhancements provided by subdivisions (b), (c), and (d). [Citation.] The electorate also updated the list of predicate offenses to be used to determine a ' "pattern of criminal gang activity" ' in subdivision (e). However, the voters reenacted section 186.22, subdivision (f) without substantive change. [Citation.] As such, subdivision (f) of section 186.22 cannot be deemed 'among the initiative's statutory provisions' made immune from legislative amendment by force of article II, section 10 of the state Constitution." (*Id*. at p. 242.) "In short, the voters left intact the Legislature's power to amend the definition of a criminal street gang in section 186.22, subdivision (f)." (*Ibid*.)

In *People v. Lopez* (2022) 82 Cal.App.5th 1 (*Lopez*), relying on *Lee*, a different panel of justices from this panel, as well as the panel that decided *Rojas*, rejected a similar argument from the Attorney General that Assembly Bill 333 improperly amended the gang conspiracy statute, section 182.5, enacted as part of Proposition 21. The court determined there was no time-specific provision in Proposition 21 for section 182.5 as there was for other provisions of the criminal law. (*Lopez*, at pp. 23–24.) This court concluded, "[W]e agree with *Lee*'s conclusion that 'the electorate clearly knew how to express the intent to freeze a statutory definition,' " and "[t]he absence of such time-specific language in section 182.5 leads to our rejection of the People's claim." (*Id*. at pp. 24–25.)

We respectfully agree with the courts' analysis in *Lee* and *Lopez* and conclude Assembly Bill 333 did not unconstitutionally amend Proposition 21 as applied to section 190.2, subdivision (a)(22).

We further conclude the same reasoning can be applied to amicus curiae's argument, which is a much broader argument than respondent's. Amicus curiae contends that Assembly Bill 333, in its entirety, is unconstitutional because it amends section 186.22, suggesting that any amendment to section 186.22 requires a two-thirds

vote. We disagree for the same reasons set forth above. As stated above, Proposition 21 did not add the definition of "criminal street gang." Though Assembly Bill 333 makes changes to the definitions of "criminal street gang" and "pattern of criminal gang activity," it does not appear the voters, in enacting Proposition 21, intended to lock those definitions in time. As such, Assembly Bill 333's changes to section 186.22, subdivisions (e) and (f) are not unconstitutional amendments to Proposition 21. Rather, those changes lawfully apply to both sections 190.2, subdivision (a)(22) and 186.22.

### 2. Remand

Finding Assembly Bill 333 to not be an unconstitutional amendment of Proposition 21, as applied to sections 190.2, subdivision (a)(22) or 186.22, generally, we turn to whether Sutton is entitled to remand. The parties agree, as do we, that Assembly Bill 333 retroactively applies to him and that the jury was not instructed on the new requirements under Assembly Bill 333.

The parties also agree, as do we, that the *Chapman v. California* (1967) 386 U.S. 18 standard for harmless error applies. "Under that standard, the absence of instruction on the amended version of section 186.22 requires reversal unless 'it appears beyond a reasonable doubt that the error did not contribute to th[e] jury's verdict.' " (*People v. E.H.* (2022) 75 Cal.App.5th 467, 479.) However, even if there was inadequate proof of the new requirements of section 186.22, "the prosecution must be afforded the opportunity to establish the additional element[s] upon remand." (*People v. Eagle* (2016) 246 Cal.App.4th 275, 280; accord, *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822–823 & fn. 19.)

The parties disagree however as to whether that harmless error standard is satisfied. We do not find the deficiencies in the jury instructions harmless beyond a reasonable doubt. The jury was not instructed that to find the gang allegations true, it had to find that the benefit to the gang from both the current offenses and the predicate offenses was more than reputational, as is now required. (§ 186.22, subds. (e)(1), (g).)

Respondent contends the evidence presented at trial was "overwhelming" and goes on to argue that the prosecution "proved beyond a reasonable doubt" the new requirements of the statute. The jury, however, was never asked to make the determination under the new requirements; they could have rejected the People's view of the evidence had they been instructed correctly. We cannot conclude beyond a reasonable doubt the instruction was harmless.

For guidance for the parties on remand, we address their dispute as to whether the prosecution is required to prove predicate offenses were committed by two or more gang members under the new legislation. We conclude it is not.

We review issues of statutory construction de novo. (*People v. Gonzales* (2018) 6 Cal.5th 44, 49.) Our goal is to determine the legislative intent of the statute. "Because the statutory language is generally the most reliable indicator of that intent, we look first at the words themselves, giving them their usual and ordinary meaning." (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1040.) When the statutory language is unambiguous, its plain meaning controls. We also "generally must 'accord[] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose,' and [the California Supreme Court] ha[s] warned that '[a] construction making some words surplusage is to be avoided.' " (*People v. Valencia* (2017) 3 Cal.5th 347, 357.) Where the language supports more than one reasonable construction, we may look to extrinsic aids, including the legislative history, for additional guidance. (*People v. Ruiz* (2018) 4 Cal.5th 1100, 1105–1106.) Finally, in exceedingly rare situations, the literal meaning of the statutory language may be disregarded to avoid absurd results. (*People v. Bell* (2015) 241 Cal.App.4th 315, 351.)

To argue that the predicate offenses were required to be committed by two or more gang members, Sutton relies on *Delgado*. Respondent contends *Delgado* was wrongly decided, and, respectfully, we agree with respondent. In *Delgado*, the court rejected "the People's contention that proof that *individual* gang members committed the predicate

33.

offenses on separate occasions is sufficient to show the gang members 'collectively' engaged in a pattern of criminal activity." (*Delgado*, *supra*, 74 Cal.App.5th at p. 1073, italics added.) Rather, the *Delgado* court "read the term 'collectively' in a commonsense manner to mean what it says—committed by more than one person, and not, as argued by the People, individually but on a different day." (*Id.* at pp. 1088–1089.) The *Delgado* court agreed with the defendant that the "amended subdivision (f)'s requirement that gang members 'collectively engage' in a pattern of criminal gang activity means the People were required to prove that two or more gang members committed each predicate offense in concert …." (*Id.* at p. 1088.) Thus, the court reversed the gang enhancement because the People presented no evidence that multiple gang members committed the predicate offenses and "because the trial court erred in instructing the jury under former subdivision (f) that it could find the gang enhancements true if the People proved that members of the … gang, '*whether acting alone* or together, engage in or have engaged in a pattern of criminal gang activity.' " (*Id.* at p. 1088, italics added.)

More recently, in *Clark*, Division Two of the Fourth District Court of Appeal, disagreed with *Delgado*'s conclusion. (*Clark*, *supra*, 81 Cal.App.5th at pp. 144–145.) The *Clark* court did not find "the *Delgado* analysis to be persuasive because it turned to legislative history after merely defining the word 'collectively.' [Citation.] It did not … devote sufficient attention to the plain language" of section 186.22, subdivision (e)(1), which remained substantively unchanged, requiring predicate offenses to be committed by two alternatives: " '[(1)] … on separate occasions or [(2)] by two or more members.' " (*Clark*, at p. 145.) The *Clark* court reasoned, "If 'collectively' means the predicate crimes had to be committed in concert, then the prosecutor must always prove the predicate crimes were committed 'by two or more members.' The alternative option that 'the offenses were committed on separate occasions' would be surplusage. (§ 186.22, subd. (e)(1).) We avoid interpreting the statute in a manner that would render one of the explicit options surplusage." (*Ibid*.)

We agree with *Clark*'s reasoning and find it is in line with the principles of statutory construction above and that the plain language of the statute allows predicate offenses to be proven by offenses committed by one gang member, so long as they are committed on separate occasions. In our view, a more reasonable interpretation of the deletion of "individually" based on the plain language of the rest of the statute is that it was done to align with the additional requirement that the predicate offenses must benefit the gang. Thus, under the new legislation, an individual committing a crime may act as part of a collective if that crime benefits the gang.

In sum, for the reasons set forth above, we agree with Sutton that the gang enhancements, vicarious firearm enhancements, and gang-murder special circumstance findings must be vacated and the matter remanded for the People to have the opportunity to retry those allegations. Should they choose to retry, however, we conclude the People are not required to prove predicate offenses were committed by two or more gang members as we have explained.

V.     **Admission of Evidence Utilizing TrueAllele DNA Interpretation**

A.     *General Background*

DNA analysts at the Kern Regional Crime Laboratory (KRCL) use a four-step procedure to process a DNA sample, which consists of extraction, quantification, amplification, and typing. That process results in a DNA profile, which is then interpreted, to determine what type of statistical analysis the profile is eligible for. At the interpretation stage, DNA profiles which have been processed from evidentiary items and have unknown contributors are compared to known reference profiles in the case. The process of comparing an unknown evidentiary DNA sample to a known reference sample can be done manually, where the analyst compares them visually side by side, or "in [the] case of a very complex evidentiary DNA profile," a software program can be used to do the comparison.

The KRCL purchased software called TrueAllele in 2013 that it used to interpret DNA profiles for cases. Dr. Mark Perlin began developing the software in 1994 for use in medical research, and in the early 2000's began developing it for use in human identification; it was used to help identify victims of the World Trade Center disaster. Perlin is the CEO of Cybergenics Corporation, which is involved in training and teaching and also provided analysis of DNA profiles.

The KRCL participated in a validation study of TrueAllele which resulted in a paper that was published in the Journal of Forensic Science in 2015. The validation study involved looking at over 200 mixture samples known to have either two, three, four, or five persons contributing to them. The TrueAllele results were compared to known results from people who had prepared the DNA samples as well as manual interpretation of the profiles. One of the analysts who participated in manual interpretation testified at trial.

The software uses mathematical statistical modeling to analyze a DNA profile and comes up with a list of every possible profile that could be contained in the sample DNA and statistically assigns a probability to each profile. The user enters known DNA references and True Allele performs a comparison and decides whether any of the known reference profiles match any of the possible genotypic profiles in the evidence. Based on the probability the software assigned before the known references were entered, it provides a statistical measure for the strength of that inclusion, using a statistical analysis called likelihood ratio, or LR. This is called "probabilistic genotyping."

Analysts at the KRCL start the interpretation process manually. Whenever the KRCL had evidence containing a DNA profile with anything more than two-person mixtures, however, the analyst would use TrueAllele. In addition, sometimes when the profiles only had one or two people, if they were weak profiles, TrueAllele would be used.

36.

The TrueAllele software was used to interpret profiles found on the physical evidence in the present case, calculating the likelihood ratios discussed *infra*, with the exception of the nylon stocking found inside the black pants recovered from the freeway, for which the likelihood ratios were calculated manually.

## B.     *Procedural Background*

Wheat moved in limine to exclude "any evidence concerning DNA analysis by TrueAllele or any other software unless that software is proven to be (1) generally accepted in the scientific community and (2) available for examination by the Defense." Wheat contended in his written motion that TrueAllele was a "new methodology that is largely untested and which remains in a 'Black Box' to date." Wheat alleged TrueAllele used two approaches to DNA analysis "not sufficiently tested or proven to be reliable: (1) low copy number analysis; and (2) probabilistic genotyping software."

The People subsequently moved to admit DNA evidence. The People argued in their written motion that no *Kelly* hearing was required because "TrueAllele Casework results have been admitted into evidence on numerous occasions in the Kern County Superior Court." The People went on to list the Kern County cases where TrueAllele evidence had been admitted, which dated back to 2013.

At the hearing on the issue, Sutton's counsel requested an Evidence Code section 402 hearing on the admission of DNA evidence. He represented that the defense had hired an expert in the case who had reviewed the DNA results and noted inconsistent results as related to Sutton on one of the pieces of evidence. Sutton's counsel represented that there were foundational issues with the evidence which was tested for DNA and it needed to be determined "whether or not TrueAllele is junk science or not pursuant to Kelly-Frye." Sutton's attorney represented that the defense had spoken to DNA experts who "do not believe in TrueAllele" and that "the system is completely flawed because it adds another layer, I guess, or guessing to which they don't think is scientific in nature."

37.

Counsel for Wheat concurred in Sutton's counsel's comments and asserted that "[t]here was a test in the near past where various labs were sent samples, asked them to make comparisons if they could, and I believe two labs found comparisons for nonexistent people," "demonstrating that serious injustices can follow from the application of this guessing game." Wheat's counsel went on to state "there is another area of objection, and that's the discovery objection." Wheat's counsel went on to say, "They will only release the key, the code, that lies at the heart of this program, and that will only be given in person to prosecutors in the State of Maryland." Wheat's counsel contended that without the code, "cross-examination is … rendered superficial."

The prosecutor responded that the "TrueAllele Casework System and other probabilistic genotyping interpretation is widely accepted in the scientific community." She went on to reiterate it had been used in many cases in Kern County and that a Kelly-Frye hearing was not necessary. She stated the defense was free to cross-examine the People's witnesses or bring in their own expert.

The trial court denied the defense's request for a *Kelly* hearing, reasoning that it had personally had experience with cases utilizing TrueAllele and there was "published case precedent" that rendered the need for a *Kelly* hearing unnecessary. The court noted the defense would be permitted to rebut the reliability of TrueAllele as used in the present case before the jury by way of their own witness.

The court granted the defense's request to have their expert present for the prosecution's DNA testimony. At trial, neither Sutton nor Wheat called their own DNA expert to testify regarding TrueAllele or any other area of DNA analysis.

C.    *Analysis*

Wheat contends the court erred by admitting DNA interpretation utilizing TrueAllele without a *Kelly* hearing with access to TrueAllele's "source code." Wheat contends the denial of access to the source code violated his federal and state rights to

confrontation and due process based on several grounds, both with regard to the *Kelly* hearing and to trial.

We need not decide whether the court's admission of the DNA evidence utilizing TrueAllele without a *Kelly* hearing was error because we conclude any error is harmless. We apply the *Watson* standard; reversal is only required if it is reasonably probable the verdict would have been more favorable to Wheat in the absence of any erroneous admission of the DNA evidence. (*People v. Venegas* (1998) 18 Cal.4th 47, 93.)

Wheat contends we must apply the more stringent *Chapman* standard because of his claims of federal constitutional error. Wheat alleges several constitutional violations: his right to confront witnesses and his due process rights to present a meaningful defense, and to a fair trial including adversarial testing of the People's evidence.

Respondent contends Wheat forfeited any constitutional claims by failing to raise them below. Wheat does not respond to this contention in his reply brief. We agree with respondent. (See *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 314, fn. 3 ["The right to confrontation may, of course, by waived, including by failure to object to the offending evidence"]; *People v. Burgener* (2003) 29 Cal.4th 833, 869 ["defendant waived his [due process and confrontation] constitutional claims by failing to articulate them below"].)

Further, while Wheat frames the issue as the court "refus[ing] to allow the defense access to TrueAllele's source code," there is no evidence on the record before us that Wheat, or Sutton, properly sought access to the source code, further denying this court an adequate record for review of his constitutional claims. Wheat's request in his written motion was for examination of the *software*; this request was made indirectly to the court in the context of his request for a *Kelly* hearing, not for preparation of his trial defense and the request made no mention of the "source code." The only mention of the source code was tangential; Wheat orally made a "discovery objection" while arguing against admission of the DNA evidence, claiming "they" would only provide the "key" or "code"

39.

to prosecutors in Maryland in person and that not having access to it would hinder cross-examination. We do not construe this as a proper request for access to the source code. Despite Wheat's counsel's vague comment, there is no evidence Wheat attempted to directly obtain the source code from any third party who had possession of it. He offered no proof of service of a subpoena. No third party appeared in the proceedings or filed a motion to quash any subpoena. Wheat did not formally move for a court order to compel discovery from any third party. Interestingly, Wheat criticizes respondent's assertion in their brief that the source code was privileged as a trade secret by saying that respondent is not the holder of the privilege. This highlights to us one of the difficulties in reviewing Wheat's claim; the holder of the privilege was not given the opportunity below to claim that privilege because no appropriate request for it was made.

Further, it does not appear Wheat adhered to standard discovery procedures in an attempt to obtain the source code from the prosecution. There is no evidence he informally or formally requested the source code directly from the prosecution, and there is no evidence the prosecution even had possession of or access to the source code.[8] [9] Wheat made no formal motion to compel the prosecution to discover the source code.

---

[8] We can locate two motions to compel discovery filed by Wheat in the record and find no reference to the source code. A stipulation and order, executed by the court in January 2018, provided that the prosecution would release several items to the defense related to the DNA analysis, including "A copy of Kern County Crime Laboratory's Internal Validation Studies of the TrueAllele Software for [the defense's] review." Wheat confirmed they had received the validation study. It appears the defense did eventually receive the other items, which included evidentiary items the defense had independently tested.

[9] Even if we were to deem Wheat's request below to exclude the evidence unless he was given access to the software can be interpreted as a discovery request of the prosecution, we agree with respondent that *People v. Superior Court* (*Dominguez*) (2018) 28 Cal.App.5th 223 is on point, assuming the prosecution did not have possession of or access to the source code. In *Dominguez*, the appellate court held that a foreign research institute which possessed the source code for a probabilistic genotyping program used in the defendant's case was not part of the prosecution team for the purpose of *Brady*, and

Finally, because the court concluded a *Kelly* hearing would not be necessary, the court did not directly address or make any order regarding Wheat's request for access to the software or the source code, and neither Wheat, nor Sutton, claimed the source code was necessary for the preparation of their defenses outside the context of the *Kelly* hearing, yet the majority of Wheat's confrontation and due process claims on appeal relate to trial rights.

This is all to say Wheat's constitutional claims regarding access to the source code are not properly before us. In his reply brief, Wheat relies heavily on a New Jersey case, *State v. Pickett* (2021) 466 N.J.Super. 270 [246 A.3d 279] (*Pickett*), to support his contention that he had constitutional due process rights to the source code. *Pickett* does not alter our conclusion regarding his constitutional claims.

*Pickett* is an appellate division appeal from a trial court's denial of the defendant's discovery motion for the TrueAllele source code for use during a hearing on the admissibility of TrueAllele interpretation evidence. In *Pickett*, the defendant moved for the source code prior to cross-examination of Perlin in the hearing. The defendant's discovery motion included a "detailed" declaration by the defense expert addressing "among other things, the uncertainty involved in DNA mixture interpretation, the need for verification and validation (V & V) of software engineering, the existence of software engineering failures, and materials relevant to testing probabilistic genotyping software." (*Pickett*, *supra*, 466 N.J.Super. at p. 284.) Perlin, too, authored a declaration submitted by the prosecution. (*Ibid.*) The *Pickett* court noted that no additional testimony was taken and it was "not surprising given the detailed record and declarations submitted by the experts addressing the source code." (*Ibid.*)

The trial court in *Pickett* denied the defendant's motion but did not address, as the appellate division stated, "the importance of allowing [the] defendant an opportunity to

thus the prosecution could not be ordered to produce the source code which was solely in the institute's possession. (*Dominguez*, at pp. 235–236.)

41.

independently evaluate whether TrueAllele's software correctly implements the probabilistic genotyping methods, …rather than relegating [the] defendant to blindly accepting that the software operated as intended." (*Pickett*, *supra*, 466 N.J.Super at p.289–290.)  The trial court further noted that the State was willing to make the source code available to the defense expert for viewing at the prosecutor's office on a provided device.  (*Id*. at p. 290.)  On appeal, the defendant maintained the State's parameters were "unreasonably burdensome and restrictive."  (*Id*. at p. 290.)

The appellate division agreed with the defendant and concluded that "due process and fairness demand access" to the source code in the context of a hearing on admission of DNA evidence utilizing probabilistic genotyping software (*Pickett*, *supra*, 466 N.J.Super. at p. 279), and thus when the State chooses to utilize an expert relying on novel probabilistic genotyping software to render DNA testimony, the defendant "is entitled to access under an appropriate protective order, to the software's source code and supporting software development and related documentation … *provided [the] defendant first satisfies the burden of demonstrating a particularized need for such discovery*" (*id*. at pp. 306–307, italics added).  The factors a judge should consider, according to *Pickett*, include "(1) whether there is a rational basis for ordering a party to attempt to produce the information sought, including the extent to which proffered expert testimony supports the claim for disclosure; (2) the specificity of the information sought; (3) the available means of safeguarding the company's intellectual property, such as issuance of a protective order; and (4) any other relevant factors unique to the facts of the case."  (*Id*. at p. 307.)

In a footnote, the appellate division addressed the argument that the source code was hearsay and considered a testimonial statement and without it the defendant's confrontation rights were violated by stating:  "We need not address issues that may arise at trial; at this point the question is whether [the] defendant is entitled to the proprietary information for the sole purpose of challenging at a *Frye* hearing the science underlying novel DNA analysis software and expert testimony.  Having concluded that [the]

42.

defendant is entitled to the review—under a protective order—questions of [the] defendant's confrontation rights at trial need not be addressed at this point." (*Pickett*, *supra*, 466 N.J.Super. at p. 296, fn. 8.)

*Pickett* is not persuasive as it applies to the present case. First and foremost, *Pickett* is in a vastly different procedural standpoint than the present case. It was not an appeal from the judgment, and the court expressly declined to address issues related to trial. In addition, *Pickett* further illustrates why this issue is not properly before us in the present case; in *Pickett*, there was a well-developed record on the defense's particularized requirement for the source code, and the matter was litigated, with a response from Perlin. In the present case, Wheat proffered no declaration by an expert demonstrating a need for the source code. As we have explained, the source code was not properly requested below and therefore Wheat's claims connected to the source code were simply not preserved for appeal.

With regard to Wheat's claim the court erroneously denied his and Sutton's request for a *Kelly* hearing, applying the *Watson* standard, we conclude there is not a reasonable probability of a more favorable result had the DNA interpretation for which the DNA analysts used TrueAllele not been admitted. Wheat's identity as one of the perpetrators was well-established by overwhelming evidence at trial. Williams and Evans testified that Wheat admitted involvement. Rocca testified Sutton told her Wheat was involved and was able to identify him on the surveillance footage of the offenses. Wheat had access to the weapons that were proved to have been used in the crime.

Further, DNA evidence independent of that interpreted by TrueAllele also supported Wheat's involvement. Dr. Ruth Dickover, the DNA analyst who interpreted many of the DNA profiles relevant to the case, testified that she could manually go over the profiles one allele at a time and see who they were consistent with and who they were not. She testified that her manual review of the profile from one of the samples taken from the black pants showed that all of Wheat's alleles were accounted for, and all of

Pina's alleles were accounted for. As to that sample, Dickover concluded, based on her manual review, that Pina's known reference profile matched the major contributor to the sample, and Wheat matched the second. Dickover highlighted Wheat's and Pina's alleles on the profile for the jury, and these profiles were admitted into evidence and available for the jury's review. Arguably, this could have been done for the jury without the likelihood ratios generated by TrueAllele and provided a basis for them to further connect Wheat to the scene based upon Pina's alleles being present on the profile. The DNA interpretation on the nylon found inside the pants, for which Wheat could not be excluded as a potential contributor with a strong match, was done manually.

The prosecution also presented Evidence Code section 1101, subdivision (b) evidence that the jury was instructed they could use to prove Wheat's identity.

We are not persuaded by Wheat's arguments that the alleged error was prejudicial. Wheat directs us to look at the timeline of the investigation, pointing out that Williams, Evans, and Sutton had all made statements implicating Wheat and Sutton to law enforcement, but no arrests were made until after the TrueAllele interpretation was done, suggesting the evidence that existed prior to the TrueAllele interpretation was insufficient to support a conviction. Our harmlessness analysis does not take into account law enforcement's choices on when to make an arrest or when the prosecution decided to file charges; we look at the state of the evidence at trial and whether, based on the entirety of that evidence, the absence of the allegedly erroneously admitted evidence would have changed the jury's verdict or resulted in a hung jury.

Wheat also points out the prosecution devoted much of their closing arguments to the DNA evidence. We disagree. As respondent points out, the prosecution's discussion of the DNA evidence, in context, constituted a reasonably proportional percentage of their closing arguments.

Finally, Wheat points out weaknesses in the prosecution's case as to his identity, primarily that Williams, Evans, and Rocca all had credibility issues, and that the firearm

44.

determined to be used in the crime was seized from the residence of Denham, not Wheat. We acknowledge that each witness and piece of evidence had weaknesses that arguably may be deemed significant if viewed in a vacuum, but in doing our harmlessness analysis, we do not view each piece of evidence in a vacuum; we view the evidence in its totality. In viewing the totality of the evidence, it is unlikely the jury would have concluded Wheat was not a perpetrator of these offenses; each piece of evidence against him made it less likely that a witness was lying regarding his involvement or that an incriminating piece of evidence was simply a coincidence. It is not reasonably probable the weaknesses of the evidence that Wheat points out, when viewed in the context of all the other evidence, would constitute reasonable doubt as to Wheat's identity in the mind of a juror.[10]

## DISPOSITION

As to Sutton, the gang enhancement allegation findings under section 186.22, subdivision (b), the gang-murder special circumstance findings under section 190.2, subdivision (a)(22), and the gang-related firearm enhancement findings under

---

[10] On September 24, 2021, respondent filed a request for judicial notice of several peer-reviewed scientific articles that they alleged show TrueAllele and other probabilistic genotyping software were generally accepted in the scientific community. Wheat filed a partial opposition asserting he did not oppose this court from considering the articles in determining the existence or absence of a debate in the relevant scientific community, but objected to this court accepting the truth of the matters set forth in the articles. On September 28, 2021, this court deferred ruling on respondent's request pending consideration of this appeal on its merits.

On February 14, 2022, Wheat filed a request for judicial notice of the United States Department of Commerce's National Institute of Standards and Technology's draft of its *DNA Mixture Interpretation: A NIST Scientific Foundation Review* (*2021*). Respondent objects to Wheat's request. On February 22, 2022, this court deferred ruling on Wheat's request pending consideration of this appeal on its merits.

We hereby deny both respondent's and Wheat's requests on the ground that they are moot in light of our conclusion that, even if the court erred by admitting the evidence without holding a *Kelly* hearing, the error was harmless.

section 12022.53, subdivision (e) are vacated, and the matter is remanded to the trial court to give the People the opportunity to retry those issues.  In all other respects, the judgment is affirmed.


                                 DE SANTOS, J.

I CONCUR:


PEÑA, J.


46.

POOCHIGIAN, Acting P. J., Concurring and Dissenting.

Under article II, section 10(c) of the California Constitution, " 'the voters have the power to decide whether or not the Legislature can amend or repeal initiative statutes.' " (*Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1251.)  The voters' power in this regard is " 'absolute.' "  (*Ibid.*)

In Proposition 21, the voters exercised that power by prohibiting amendment of its provisions "by the Legislature except by a statute passed in each house by rollcall vote … two-thirds of the membership of each house concurring, or by a statute that becomes effective only when approved by the voters."  (Voter Information Guide, Primary Elec. (Mar. 7, 2000) text of Prop. 21, § 39, p. 131 (Voter Guide).)  Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333) satisfies neither condition.  And, as explained below, Assembly Bill 333 clearly amended Proposition 21, because it prohibits the application of enhanced sentences in several of the contexts for which Proposition 21 (as modified by subsequent lawful amendments) would impose them.  (See *People v. Superior Court* (*Pearson*) (2010) 48 Cal.4th 564, 571 [a statute amends an initiative if it "prohibits what the initiative authorizes, or authorizes what the initiative prohibits"].)

In concluding otherwise, the majority rejects *People v. Rojas* (2022) 80 Cal.App.5th 542, review granted October 19, 2022, S275835, and relies instead on *People v. Lopez* (2022) 82 Cal.App.5th 1 (*Lopez*) and *People v. Lee* (2022) 81 Cal.App.5th 232, review granted October 19, 2022, S275449 (*Lee*).  That reliance is misplaced.  I respectfully dissent on this issue and otherwise concur in the judgment.

### *Assembly Bill 333 Amended Proposition 21, For Better or Worse*

Section 11 of Proposition 21 "increas[ed] the sentences for 'gang-related' … murder."  (*Lee*, *supra*, 81 Cal.App.5th at p. 244.)  Immediately, we can see two obvious ways this provision could be substantively amended:  (1) changing the sentence applicable to gang-related murders or (2) changing which gang-related murders are

subject to the increased sentences. Assembly Bill 333 clearly and directly does the latter.[1] Therefore, it is an amendment of Proposition 21 and needed to satisfy section 39.

Cases that have concluded otherwise insist that punishment is "distinct" from the crime being penalized. (See *Lee*, *supra*, 81 Cal.App.5th at p. 244, citing *People v. Superior Court (Gooden)* (2019) 42 Cal.App.5th 270, 281.) These cases fail to appreciate that the very concept of punishment is a penalty being imposed *for* engaging in certain conduct. The conduct being penalized is as much a part of a "punishment" as the penalty being imposed on the conduct. Neither the penalty *nor the penalized crime* can be considered distinct from a punishment provision because they are, together, its component parts. There is no punishment without a crime and a penalty.

Perhaps it could best be described another way. What the voters did in section 11 of Proposition 21 was point to a specific universe of real-world conduct and say they wanted harsher penalties for it.[2] They did not increase all sentences for all crimes, they increased the sentence for a specific crime: gang-related murder.[3] Thus, the core of what section 11 truly "authorized" boils down to *the connection* between increased penalties (death, life without parole (LWOP)) and the real-world conduct to which they apply

---

[1] Prior to Assembly Bill 333, certain gang-related murders were subject to death or LWOP under Penal Code section 190.2, subdivision (a)(22). Assembly Bill 333 narrowed the universe of conduct subject to death or LWOP under section 190.2, subdivision (a)(22) in several ways. (*People v. Rojas*, *supra*, 80 Cal.App.5th at pp. 554–555.) For example, under section 11 of Proposition 21 (and subsequent legislative amendments to § 4 that passed by a two-thirds majority), a defendant who intentionally killed the victim while an active member of a group whose primary activities include looting and felony vandalism, but do not include the other crimes listed in section 186.22, subdivision (e), would be subject to a sentence of death or LWOP under section 190.2, subdivision (a)(22). However, under Assembly Bill 333, such a defendant would not be subject to those enhanced penalties. In this situation (and several others) (see *People v. Rojas*, at pp. 554–555), Assembly Bill 333 "prohibits" the enhanced sentences that Proposition 21 authorized.

[2] Which in turn relies on section 4 to define the scope of applicable conduct.

[3] They also increased penalties for other gang-related crimes.

2.

(gang-related murders as defined by §§ 4 and 11 of Prop. 21). A change to *either* end of that connection amends the very core of what section 11 prescribed. That is why changing the crime to which the increased sentence applies amends the voters' enactment as much as changing the sentence itself would.

### *The Majority's Reliance on* **Lee** *and* **Lopez** *is Misplaced*

The majority reaches a contrary conclusion, relying on *Lee* and *Lopez*. (Maj. opn., *ante*, at p. 33.)

*Lee*, *supra*, 81 Cal.App.5th 232 concluded that because Proposition 21 did not amend subdivision (f), the latter is not "immune from legislative amendment" under the constitution.[4] (*Lee*, at p. 242.) This reasoning relies on the faulty premise that the rules against legislative amendments of propositions only prohibit changes to the specific language enacted or amended by the proposition. That premise is untenable under *People v. Kelly* (2010) 47 Cal.4th 1008 (*Kelly*). In *Kelly*, the legislation at issue did not "literally amend" the initiative statute itself. (*Id.* at pp. 1014.) Rather, the legislation enacted a new, separate statute, that placed "limitations" on the scheme established by the initiative statute. (*Id.* at pp. 1014, 1042–1043.) However, that fact was no impediment to the high

---

[4] *Lee* initially acknowledges Proposition 21's two-thirds majority requirement. However, it then goes on to incorrectly frame the issue as whether the electorate intended to entirely preclude legislative amendments. The opinion makes statements such as, "[t]here is simply no basis to believe that the voters understood they were precluding future amendments of subdivision (f) …." (*Lee*, *supra*, 81 Cal.App.5th at p. 243.) And that there is no basis to conclude the voters "did not intend to permit any future amendment of that provision to be incorporated into the gang-murder special circumstance." (*Id.* at p. 242.) And that section 186.22 cannot be deemed among the provisions made "immune from legislative amendment" by the constitution. (*Ibid.*)

No one is suggesting that Proposition 21 "precludes" or has "immunity" from amendment by the Legislature. There is no doubt that the Legislature could prohibit what Proposition 21 authorizes or authorize what it prohibits, so long as it does so by a two-thirds majority vote of the Legislature.

3.

court finding that the legislation "improperly amends" the initiative statute. (*Id.* at p. 1043.)

Thus, legislation may violate the rules against amending initiatives even when the legislation does not "literally amend" the specific words added by the initiative statute. The need for this principle is obvious. Any desired legal effect that can be accomplished by rewriting an existing statute can also be accomplished by writing a new statute that limits or expands the existing one. Calling the former an amendment, but not the latter, merely because of where words are placed, is sophistry and an abdication of our role to safeguard the initiative process. (See *California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 938–939 [courts have obligation to jealously guard voters' exercise of initiative power].) Such a rule would make it laughably easy for the Legislature to entirely avoid the restrictions of section 39 of Proposition 21 and article II, section 10(c) of the California Constitution

The question is not: What literal wording did the initiative alter? (Contra, *Lopez*, *supra*, 82 Cal.App.5th at p. 19.) Rather, the question is: What legal effects did the initiative prohibit or authorize?

In a similar vein, *Lopez* observes that Assembly Bill 333 revised subdivision (e) as it existed *before* Proposition 21. (*Lopez*, *supra*, 82 Cal.App.5th at p. 20.) This is a nonsequitur. As established in *Kelly*, *supra*, 47 Cal.4th 1008 and described above, the mere fact that the Legislature is amending a different statute than the one enacted by the initiative is not dispositive to the analysis under article II, section 10(c) of the California Constitution. The question is not whether the legislation "literally amends" the wording of the initiative statute itself, but rather whether the legislation prohibits what the initiative authorized. When a punishment statute enacted by initiative authorizes a specific penalty for particular conduct, and the Legislature subsequently narrows the conduct to which the penalty applies, the Legislature has clearly prohibited part of what the initiative authorized. Specifically, the Legislature has prohibited the application of

4.

the increased penalty to the subset of conduct now excluded by the narrowed definition. *This is true regardless of whether the initiative defined the scope of penalized conduct itself or relied on a preexisting definition of the conduct.*

These principles are reflected in the following hypothetical:

"Imagine a jurisdiction where the only crime relating to driving under the influence was defined as 'operating a motor vehicle with a blood-alcohol content of over 0.08' and carried a punishment of six months in jail. And suppose the voters, apparently angered by deaths and injuries caused by all drunk drivers, passed an initiative increasing punishment for that crime to one year in jail. Further suppose the Legislature subsequently narrowed the definition of the crime by raising the threshold blood-alcohol content to 0.15 percent and above. One might say such an amendment merely changed an element of the crime and did not affect punishment. But this formalistic distinction would prove illusory because the amendment to the elements of the crime would have the direct and intentional effect of eliminating *punishment* for certain conduct – e.g., operating a motor vehicle with a blood-alcohol content of 0.09 to 0.14 percent. This exposes the truth that a legislative change to the *elements* of a crime does affect the *punishment* established by the voters." (*People v. Rojas*, *supra*, 80 Cal.App.5th at p. 556–557.)

In this hypothetical, the legislative amendment altered a criminal definition that the initiative did not itself enact or change. Nonetheless, it is clear the legislative enactment had the direct and intentional effect of prohibiting something the initiative authorized by eliminating *punishment* for driving with a blood-alcohol content of 0.09 to 0.14 percent.

If the voters say they want Penalty X to apply to Conduct Y, the definitions of *both* Penalty X and Conduct Y are equally integral, indispensable components to the *singular* policy choice they have made. Changing Conduct Y amends the initiative's authorization just as changing Penalty X does. The fact that Conduct Y may have been defined before the initiative passed is not dispositive.

5.

### *Sections 14 and 16 of Proposition 21*

*Lee*, *supra*, 81 Cal.App.5th 232, attaches dispositive significance to language that appears in sections 14 and 16 of Proposition 21 but does not appear in connection with section 186.22.  Section 14 of Proposition 21 provides:  "… *Notwithstanding subdivision (h) of Section 667, for all offenses committed on or after the effective date of this act, all references to existing statutes in subdivisions (c) to (g), inclusive, of Section 667, are to those statutes as they existed on the effective date of this act, including amendments made to those statutes by this act.*"  (Voter Guide, *supra*, text of Prop. 21, § 14, p. 123.)  Section 16 of Proposition 21 provides:  "… *Notwithstanding Section 2 of Proposition 184, as adopted at the November 8, 1994 General Election, for all offenses committed on or after the effective date of this act, all references to existing statutes in Section 1170.12 are to those statutes as they existed on the effective date of this act, including amendments made to those statutes by this act*."  (Voter Guide, *supra*, text of Prop. 21, § 16, p. 124.)

*Lee* reasons that if voters intended make a time-specific incorporation of section 186.22, subdivision (f), they would have said so in a provision similar to section 14 or 16.  (*Lee*, *supra*, 81 Cal.App.5th at pp. 242–243.)  Not so.  Unlike the explicit references to sections 667 and 1170.12, there was no need for an extra provision to expressly reference a date-specific version of section 186.22 because it was being concurrently reenacted in Proposition 21 itself.  (See Voter Guide, *supra*, text of Prop. 21, § 4, pp. 119–120.)  In fact, it would have been quite peculiar for voters to spell out, "all references to section 186.22 are to the version we are re-enacting right now."  That fact is self-evident.

### *Conclusion*

*Lopez* and *Lee* ask the wrong questions and then answer them incorrectly.  The simple, dispositive questions are:  (1) What did section 11 authorize? and (2) Did Assembly Bill 333 change it?  The simple answers are that section 11 authorized

6.

increased sentences for specific conduct and Assembly Bill 333 changed the conduct to which the increased sentences apply.

For these reasons, I respectfully dissent as to the constitutionality of Assembly Bill 333's amendment of Proposition 21 and otherwise concur in the judgment.


POOCHIGIAN, Acting P. J.